In re the MARRIAGE OF M. Randall VANET, Appellant,

and

Charlotte W. Vanet, Respondent.

In re M. Randall VANET, Petitioner.

M. Randall VANET, Appellant,

v.

Charlotte W. VANET, Respondent.

Nos. KCD 27751, KCD 28396 and KCD 28606.

Missouri Court of Appeals, Kansas City District.

Oct. 12, 1976.

Motion for Rehearing and/or Transfer Denied Nov. 29, 1976.

238

Max W. Foust, Morris, Foust, Beckett &
Ponick, Kansas City, for appellants.

Thomas D. Cochran, Piedimonte & Cochran, Independence, William V. North, Cooke, North, Dickson & Bornholdt, Chartered, Prairie Village, for respondent in 27751.

Ralph L. Martin, Pros. Atty. by Robert Frager, Asst. Pros. Atty., Kansas City, for respondent in 28606 & 28396.

Before SHANGLER, P. J., and SWOFFORD and SOMERVILLE, JJ.

SOMERVILLE, Judge.

Three cases have been consolidated for appellate review. A brief description of each reveals a common thread running through them which prompted consolidation. No. KCD 27751 is an appeal in a dissolution of marriage proceeding wherein the husband challenges the decree entered by the trial court with respect to the division of marital property, the amounts awarded to the wife for maintenance and child support, and the allowance of attorney fees to the wife. No. KCD 28396 is a habeas corpus proceeding initiated by the husband to obtain his release from confinement in the Jackson County Jail pursuant to a judgment finding him guilty of "indirect criminal contempt" for failure to comply with the decree entered in the dissolution of marriage proceeding regarding payment of maintenance and child support. No. KCD 28606 is a direct appeal by the husband from the judgment finding him guilty of "indirect criminal contempt" for failure to comply with the decree entered in the dissolution of marriage proceeding regarding payment of maintenance and child support.

The cases will be addressed in numerical order and relevant facts will be interspersed throughout subsequent discussions touching the various issues raised.

The husband presses for modification of the decree entered in the dissolution of marriage proceeding on three grounds: (1) the division of marital property was inequitable and violative of the guidelines set forth in Section 452.330, RSMo Supp.1973; (2) the amounts awarded to the wife for maintenance and child support were erroneously based on the husband's prior and anticipated earning capacity and excluded consideration of the wife's "earning capacity"; and (3) the allowance of attorney fees to the wife was unwarranted in view of the division of marital property, and otherwise unsupported by the evidence.

The marriage was consummated approximately twenty-one years prior to its dissolution. Three minor children are involved, ages eleven, nine, and five, respectively. The wife was awarded custody of the minor children. The husband is a lawyer. Since 1963 the wife has filled the role of mother and homemaker. Prior to 1963 she worked as a secretary. Her secretarial skills consisted of typing and transcribing from recording devices. The decree below divided the marital property between the husband and wife as follows:

| WIFE | | HUSBAND | |
|---|---|---|---|
| Family home - fair market value of equity | $44,362.50 | Undivided half interest in thirty-seven acres of unimproved land in Platte County - fair market value of equity | $31,267.78 |
| Stocks - fair market value | 66.25 | Stocks - fair market value | 772.50 |
| 1969 Buick Station Wagon - fair market value | 1,150.00 | 1973 Corvette - fair market value of equity | 2,909.36 |
| Household furniture and appliances - fair market value | 7,000.00 | Office furniture and apartment furniture - fair market value | 2,500.00 |

Based on the above values the wife's share of the marital property totaled $52,578.75 and the husband's share of the marital property totaled $37,449.64. Percentagewise the wife was awarded approximately 58% of the marital property and the husband approximately 42%. The husband contends that this disparate division of marital property was further compounded by the fact that he was saddled with approximately $18,695.07 in debts (exclusive of indebtedness against the undivided one-half interest in the thirty-seven acres of unimproved land in Platte County), which, in reality, effectively shrunk his share of the marital property percentagewise to approximately 26% and increased the wife's share percentagewise to approximately 74%.

The extent of a trial court's power to divide marital property in a dissolution of marriage proceeding is not totally unbridled. To the contrary, the extent of a trial court's power to divide marital property is circumscribed by paragraph 1 of Section 452.330, RSMo Supp.1973, which provides that the trial court " . . . shall divide the marital property in such proportions as the court deems just after considering all relevant factors including: (1) The contribution of each spouse to the acquisition of the marital property, including the contribution of a spouse as homemaker; (2) The value of the property set apart to each spouse; (3) The economic circumstances of each spouse at the time the division of property is to become effective, including the desirability of awarding the family home or the right to live therein for reasonable periods to the spouse having custody of any children; and (4) The conduct of the parties during the marriage." Paragraph 1 of Section 452.330, supra, however does not command parity in the division of marital property, nor does it mandate that it be done with mathematical nicety by means of a stereotyped mathematical formula. If such was intended, it would have been an easy drafting task for the legislature to have said that marital property shall be divided equally between the spouses. The legislature in its wisdom obviously saw fit to vest trial courts with broad discretionary power in determining the respective portions of the spouses when making a division of marital property.

It is also significant that the legislature voiced a proper concern for the welfare of minor children of a marriage with respect to the division of marital property—the "desirability" of awarding the "family home to the spouse [in this instance the wife] having custody of any children" being a relevant factor for consideration in dividing the marital property. Subparagraph (3) of paragraph 1 of Section 452.330, supra. In light of the desirability of awarding the family home to the spouse having custody of any children, in this instance the wife, the division of marital property takes on a different complexion. Any tone of disparity seemingly cast by the division is further mellowed by the nature and value of the remainder of the marital property which the wife received—stocks valued at $66.25, a six year old Buick station wagon valued at $1,150.00, and household furniture and appliances valued at $7,000.00, with a total fair market value of $8,216.25. On the other hand the decree entered by. the trial court set over marital property to the husband having a fair market value of $37,-449.64. Except for stock having a fair market value of $66.25, the remainder of the marital property set over to the wife, to-wit, the family home, the six year old Buick station wagon and the furniture and appliances, usewise inured to the benefit of the children of the marriage as well as to the wife.

The proportionate share to be set over to each spouse in the division of marital property is a matter peculiarly within the discretion of the trial court in view of the statutory language of paragraph 1 of Section 452.330, supra, as judicially construed in this state, and will not be disturbed on appeal absent a showing of an abuse of discretion. *In re Marriage of Powers*, 527 S.W.2d 949, 951 (Mo.App.1975); *Conrad v. Bowers*, 533 S.W.2d 614, 623 (Mo. App.1975), and *Murray v. Murray*, 538 S.W.2d 587, 588 (Mo.App.1976). This court does not mean to imply that the "desirabili-

ty" of awarding the family home to the spouse having custody of minor children is an island in and of itself, to the exclusion of all other relevant factors for determining a "just" division of marital property. However, in view of the particular facts of this case, the trial court's obvious consideration of this statutorily recognized "relevant factor" in determining a "just" division of the marital property insulates its decree from being castigated as an abuse of discretion. Moreover, other relevant factors statutorily prescribed in subparagraphs (1), (2), (3), and (4) of paragraph 1 of Section 452.330, supra, to be considered in determining a "just" division of marital property—the contributions of the respective spouses to the acquisition of such property, including the wife's contribution as a "homemaker", the value of any non-marital property set apart to either spouse, the economic circumstances of each spouse at the time the marital property is divided, and the "conduct" of the spouses "during the marriage"—bespeak of a "just" division of marital property in this case rather than an "unjust" or "inequitable" division.

The record discloses that the wife was the principal "breadwinner" after the marriage while the husband completed his legal education and that she continued working and contributed to the family income until the advent of the first child in 1963. The financial contribution made by the wife towards the husband's legal education was of inestimable value with respect to acquisition of the marital property. The non-marital property set apart to the wife, stocks having a value of $2,148.00 which were purchased with a small inheritance which she received, is of nominal value in view of today's rampant inflation. The "economic circumstances" of the wife at the time the marital property was divided were far less desirable than were those of the husband since he possessed the earning power of a lawyer while she possessed only the earning power of a secretary of limited skill. Her earning power, at best, was more imaginary than real under existent circumstances. She bore the responsibility of rearing three children of tender age and her entry into the labor market was apparently viewed by the trial court as a matter of last resort. There was no evidence in the record of errant conduct on the part of either spouse during the marriage.

■ The facts iterated above, when coupled with the desirability of awarding the family home to the wife, since, she was awarded custody of the three minor children, completely vitiate the husband's contention that the division of marital property was "inequitable" and violative of the guidelines laid down by Section 452.330, supra. By the same token, the trial court cannot be said to have abused its discretion in dividing the marital property.

The decree below awarded the wife $400.00 per month for maintenance and $166.66 per month for each child for child support, to be paid bi-monthly by the husband to the circuit clerk as trustee for remittance to the wife as provided for in Section 452.345, RSMo Supp. 1973. The husband does not attack the amounts awarded for maintenance and support as excessive when measured against the needs of the wife and children, and a plethora of evidence is contained in the record to support the size of the amounts awarded.

Notwithstanding the needs of the wife and children, the husband attacks the amounts awarded for maintenance and child support on other grounds. With respect to the amount awarded to the wife for maintenance, he contends that the trial court obviously excluded consideration of the "earning capacity" of the wife and erroneously predicated the same upon his past and anticipated earning capacity rather than upon his present income. To supplement this contention, the husband argues that the amount awarded for maintenance ignores consideration of subparagraph (1) of paragraph 2 of Section 452.335, RSMo Supp. 1973 (the wife's "financial resources" and her ability to meet her "needs independently") and subparagraph (6) of paragraph 2 of Section 452.335, supra (the husband's ability "to meet his needs while meeting those of the spouse seeking maintenance"). He ad-

vances a similar contention with respect to the amount awarded to the wife for child support. To supplement the latter, he argues that the amount awarded for child support ignores consideration of subparagraph (3) of Section 452.340, RSMo Supp. 1973 (the wife's "financial resources") and subparagraph (6) of Section 452.340, supra (the husband's "financial resources and needs").

Prior to October, 1973, the husband was a member of an established law firm and the record discloses that he had an adjusted gross income of $41,856.87 in 1972 and $40,-279.45 in 1973. For reasons unexplained in the record, the husband decided to "launch out" on his own in October of 1973 and establish his own law firm. Trial of this case began on September 17, 1974. During the transitional period of the husband's law practice, i. e., the first eight months of 1974, his monthly income averaged $1,786.25. The record also reveals that the husband had work in progress which at the time of trial had not yet matured into fees. Moreover, the husband testified that after, "We have developed our practice a little more, I'm satisfied I will make more than [$]1800.00 a month income . . . I made more than that in the past and I'm a good enough lawyer . . .". Beyond question, the record discloses that the trial court, along with other matters, considered the husband's prior and anticipated earning capacity in fixing the amounts awarded to the wife for maintenance and child support. The husband argues that it was improper for the trial court to do so. Prior to enactment of the Dissolution of Marriage Act (Sections 452.300 to 452.415, RSMo Supp. 1973), it was judicially recognized in this state that the husband's capacity to pay was a proper consideration in determining marital allowances. Concomitantly, past earnings of a husband were judicially recognized as evidence of his capacity to pay [*Weiss v. Weiss,* 392 S.W.2d 646, 647 (Mo. App.1965) and *Richardson v. Richardson,* 524 S.W.2d 149, 153 (Mo.App.1975)] as well as "probable future prospects" [*Knebel v. Knebel,* 189 S.W.2d 464, 467 (Mo.App.1945) and *Page v. Page,* 516 S.W.2d 537, 540 (Mo.App.1974)].

■ A careful reading of Section 452.335, supra, relative to awarding maintenance and of Section 452.340, supra, relative to awarding child support, impel the conclusion that they are devoid of any statutory language excluding or condemning consideration of a husband's prior and anticipated earning capacity in fixing the amounts to be awarded a wife for maintenance and child support. This court concludes that the husband's prior and anticipated earning capacity falls within the purview of subparagraph (6) of paragraph 2 of Section 452.-335, supra (the "ability of the spouse from whom maintenance is sought to meet his needs while meeting those of the spouse seeking maintenance"), which is listed as a "relevant" factor for determining what constitutes a "just" award for maintenance, and within the purview of subparagraph (6) of Section 452.340, supra (the "financial resources" of the husband), which is listed as a "relevant" factor for determining what constitutes a "reasonable" amount for child support.

■ Judicial determination of a "just" amount for maintenance and a "reasonable" amount for child support, in conjunction with a husband's capacity to pay, is fraught with difficulty when, as here, the husband is a professional man without a fixed income. A lawyer's professional education and right to practice law are in the nature of a "financial resource" and a measure of "ability" and should not be lightly discounted. The members of this court are not so far removed from the practice of law that they are blind to the fact that a lawyer's income is subject to fluctuation, and, if for no other reason, a lawyer's capacity to pay maintenance and child support, if realistically assessed, properly entails consideration of both his past and anticipated earning capacity.

■ The husband's argument that the trial court improperly excluded consideration of the "earning capacity" of the wife in arriving at the amounts awarded for maintenance and child support is barren of per-

suasion. As previously noted, he bottoms this argument on the proposition that the wife's "financial resources" constitute a relevant factor which must be considered in determining the amount to be awarded for maintenance (subparagraph (1) of paragraph 2 of Section 452.335, supra) and the amount to be awarded for child support (subparagraph (3) of Section 452.340, supra). He mistakenly takes the position that his wife's "earning capacity" as a secretary constituted a "financial resource" to be properly weighted by the trial court in determining the amounts awarded for both maintenance and child support. In doing so he has either overlooked or conveniently ignored the positive mandate of paragraph 1 of Section 452.335, supra: "1. In a proceeding for . . . dissolution of marriage . . . the court may grant a maintenance order to either spouse, but only if it finds that the spouse seeking maintenance (1) Lacks sufficient property, including marital property apportioned to him, to provide for his reasonable needs; and (2) Is unable to support himself through appropriate employment or *is the custodian of a child whose condition or circumstances make it appropriate that the custodian not be required to seek employment outside the home.*" (Emphasis added.) In the instant case the wife was given custody of the three minor children all of whom were of tender years. It is implicit that the trial court concluded that it would be inappropriate to force the wife to seek employment outside the home since she had the responsibility of caring for and rearing the three minor children. Consequently, the wife's alleged "earning capacity", under the circumstances of this case, is an illusory "financial resource" at best, and entitled to little if any weight in determining the proper amount to be awarded as maintenance; nor should her "earning capacity" be viably considered a "financial resource" in determining the proper amount to be awarded as child support. It would be the height of judicial inconsistency to say that the wife was entitled to maintenance because of the inappropriateness of forcing her to seek employment outside the home by virtue of the fact she was given custody of the three minor children and in the same breath to say that her "earning capacity" constituted a "financial resource" which should be taken into consideration in determining the proper amount to be awarded as child support. The law is laced with enough unintentional inconsistencies without knowingly adding others where the welfare of minor children is involved.

■ The able and conscientious trial judge who heard this case was not presented an easy task. He candidly stated in the record that he did not savor the judicial task which confronted him. However, as would be expected by those who know him, he did not shirk his judicial responsibility and with objective fairness concluded that the wife was entitled to an award of $400.00 per month for maintenance and $166.66 per month for each of the three children for child support. This court discerns no abuse of sound judicial discretion on his part in fixing the amounts awarded.

The husband faults the allowance of $1,250.00 to the wife for attorney fees because: (1) the division of marital property, the "earning capacity" of the husband and wife respectively, and certain indebtedness borne by the husband, rendered such allowance improper; and (2) the amount awarded was unsupported by the evidence. The principal argument advanced by the husband appears to be that the wife was equally if not more financially able to pay her attorney than was the husband. Section 452.355, RSMo Supp. 1973, herein applicable, states that the " . . . court . . after considering all relevant factors including the financial resources of both parties may order a party to pay a reasonable amount . . . to the other party . . for attorney's fees . . .."

■ The "financial resources" of a party referred to in Section 452.355, supra, or, as more basically expressed, the need of a party seeking attorney fees, is but one factor to consider in awarding such fees. There are additional reasons for concluding that the husband's position is bereft of logic

and reason to support it. In view of the disposition, supra, of the complaints leveled by the husband against the division of marital property and the amounts awarded the wife for maintenance and child support, the trial court was obviously unable to say with a clear conscience that the wife had sufficient "financial resources" to bear the expense of this dissolution of marriage proceeding initiated by the husband. To the husband's credit, he does not penuriously contend that the wife was obliged to spend the fruits of her small inheritance to pay her attorney fees. This court fails to find any abuse of discretion on the part of the trial court in awarding attorney fees to the wife.

The husband's final complaint is that the amount of attorney fees awarded was unsupported by the evidence. The wife's attorney, without objection, although not under oath, in open court outlined to the trial judge that he had expended approximately fifty-one hours time in representing the wife and that he charged $50.00 per hour for his services. As stated in *Agnew v. Johnson,* 352 Mo. 222, 176 S.W.2d 489, 493–94 (1943), cited with approval in *Jafarian-Kerman v. Jafarian-Kerman,* 424 S.W.2d 333, 340 (Mo.App.1967), " . . . courts are themselves experts on the question of attorneys' fees and the judge who personally tries a case and is acquainted with all the issues involved is in a position to fix the amount of attorneys' fees without the aid of evidence." This court does not condone the lax manner in which the wife's attorney presented the amount of time expended in representing the wife and the claimed value of his services. The laxity noticed here has become far too prevalent regarding presentation of the amount and value of legal services claimed in marital proceedings and the bar should take heed of this court's disapproval of such practice. Nevertheless, since the amount awarded to the wife for attorney fees does not appear unreasonable on its face, and in view of the authorities just cited, this court is unwilling to say that the trial court abused its discretion in fixing the amount awarded to the wife.

As previously noted, case No. KCD 28896 is an original proceeding in habeas corpus brought by the husband. A writ of habeas corpus, as prayed for by the husband, was issued by this court on November 5, 1975. Pending final determination of the matter, this court on November 5, 1975, ordered the husband released to bail on his personal recognizance. The husband's application for a writ of habeas corpus was triggered by the following events. On July 20, 1975, the Prosecuting Attorney of Jackson County, Missouri, with the consent of the wife, instituted proceedings pursuant to Section 452.345, RSMo Supp. 1973, to cite the husband for contempt for failure to pay certain bi-monthly maintenance and support sums which were awarded the wife by the decree entered in the dissolution of marriage proceeding. The matter was heard on November 4, 1975, at the conclusion of which the husband was found guilty of "indirect criminal contempt" and, ostensibly under the authority of Section 476.120, RSMo 1969, he was sentenced to ninety days imprisonment in the Jackson County Jail with the proviso that "[a]fter serving 6 days, he is to be released from custody on probation for one (1) year, under the supervision of the Prosecuting Attorney, on condition he makes future payments regularly, and make up arrearages in accordance with a schedule provided by the Prosecuting Attorney." The husband's application for writ of habeas corpus antedated two recent and significantly controlling decisions concurrently handed down by the Supreme Court of Missouri, en banc, on March 8, 1976, namely *Teefey v. Teefey,* 533 S.W.2d 563 (Mo. banc 1976) and *State ex rel. Stanhope v. Pratt,* 533 S.W.2d 567 (Mo. banc 1976). *Stanhope,* so far as here germane, held that a judgment providing for imprisonment for contempt for failure on the part of a husband to pay maintenance and support did not violate Art. I, Sec. 11, Constitution of Missouri, forbidding imprisonment for debt. *Teefey,* supra, held that contempt proceedings pursuant to Section 452.345, supra, to enforce the rights of a wife and to compel obedience by a husband for payment of maintenance and child support fixed by a

decree in a dissolution of marriage proceeding were civil in nature and subject to review on appeal. *Stanhope* and *Teefey*, supra, leave this court no choice but to conclude that its writ of habeas corpus in No. KCD 28396 was improvidently issued and should be quashed. Particularly so, since the merits of the husband's attack on the judgment and order of commitment entered in the contempt proceeding can be reached on his appeal therefrom (No. KCD 28606). As noted in *Teefey*, l. c. 565, "the fact that that the trial court designated this as criminal contempt does not necessarily make it such", and the Supreme Court, for dispositional purposes, proceeded to treat the matter as a civil contempt proceeding.

Numerous issues have been raised by the husband on appeal in No. KCD 28606 (the appeal from the judgment entered and the warrant of commitment issued in the contempt proceeding). Many of them have been laid to rest by *Teefey v. Teefey*, supra, and *State ex rel. Stanhope v. Pratt*, supra. Issues falling in the category just mentioned will not be addressed because they afford no basis for relief to the husband. The only issues which will be addressed are those unresolved by *Teefey* and *Stanhope* and deemed necessary to dispose of this appeal.

The husband alleges and argues that there was no evidence that he was financially able to make the maintenance and support payments which were claimed to be in arrears or that he had intentionally and contumaciously placed himself in a position so that he could not do so. As pronounced in *Teefey v. Teefey*, supra, l. c. 566–67, in a civil contempt proceeding of this nature, ". . . trial court should be convinced that the person is financially able to make the required payment or that he has intentionally and contumaciously placed himself in a position so that he could not comply with the court's order." The court in *Teefey*, l. c. 567, carefully refrained, however, from deciding which party had the burden of proof with respect thereto: "The question as to which party has the burden of

proof in that regard has not been briefed and we do not elect to decide it in this case." Thus, *Teefey* apparently left open the question of whether the proponent in a civil contempt proceeding of this nature has the burden of proving that the alleged contemnor was "financially able to make the required payment or that the has intentionally and contumaciously placed himself in a position so that he could not comply with the court's orders" or whether the alleged contemnor has the burden of proving that *he was not* "financially able to make the required payment" *and that he had not* "intentionally and contumaciously placed himself in a position so that he could not comply with the court's orders." This presents a question of first impression in this state which will likely plague bench and bar until it is decided. If the burden of proof in this regard rested upon the husband, the alleged contemnor, then he will not be heard to complain that there was no evidence that he was financially able to make the maintenance and support payments which were claimed to be in arrears or that he had intentionally and contumaciously placed himself in a position so that he could not do so.

The question of who carries the burden of proof in a civil contempt proceeding of this nature regarding the issue presently under consideration is the subject of an extensive annotation in 53 A.L.R.2d 591, 607–15. As disclosed therein, the overwhelming weight of authority is that the burden of proof rests upon the alleged contemnor. Apparently thirty-five jurisdictions subscribe to the view that the burden of proof rests upon the alleged contemnor, while apparently only three subscribe to the view that the burden of proof rests upon the proponent.

Judicial rationalization for impressing the burden of proof upon the alleged contemnor has variously taken one or several of three approaches—evidence relative to the alleged contemnor's ability or inability to pay is more readily available to the alleged contemnor than it is to the

proponent; the trial court which tried the underlying action has already heard evidence and determined the alleged contemnor's ability or inability to pay; and the proponent has established a prima facie case by proving entry of the decree and default on the part of the alleged contemnor to pay the amount or amounts awarded therein. It strikes this court that there is an additional related reason for holding that the burden of proof should rest on the alleged contemnor. Bearing in mind that the contempt involved is civil in nature (*Teefey v. Teefey*, supra), as opposed to criminal, the following statement of law contained in 17 C.J.S. Contempt § 84(2), p. 214, reveals an equally cogent rationale for placing the burden of proof on the alleged contemnor: "If an affirmative defense is set up or called for, the burden is on defendant to sustain it. So, where a court order and its violation are established or admitted, the burden is on accused to show facts which will excuse his default, and if the defense or excuse is that of inability to comply with the order, defendant has the burden of proving such inability, that it was real, and not occasioned by his own acts." This court subscribes to the majority view revealed by the annotation in 53 A.L.R.2d 591, supra. When the proponent in a civil contempt proceeding pursuant to Section 452.345, supra, makes a prima facie case, the financial inability of the alleged contemnor to make the required payment and that his financial inability to do so was not "intentionally and contumaciously" brought about by his own conduct, is in the nature of an affirmative defense and the burden of proof in this regard is upon the alleged contemnor. Having concluded that the husband carried the burden of proving his inability to pay, and that such was not occasioned by his own conduct, his attack on the sufficiency of the evidence to support the judgment of contempt and warrant of commitment fails.

The husband also attacks the judgment finding him in contempt and the warrant of commitment on the ground they lack specificity and improperly impose probation.

The judgment and warrant of commitment are both silent as to the amount or amounts of maintenance and child support which were in arrears at the time of the hearing. Serving to compound this void, the record discloses an evidentiary conflict between the amount of arrearages claimed due and owing by the proponent, and the amount claimed due and owing by the husband, at the time of the hearing. Citing *Gompers v. Buck's Stove and Range Company*, 221 U.S. 418, 447, 31 S.Ct. 492, 55 L.Ed. 797 (1911), the court in *Teefey v. Teefey*, supra, l. c. 566, pointedly observed that "[t]he civil contemnor has at all times the power to terminate his punishment by compliance with the order of the court—i. e.: purging." The judicially recognized right of a defaulting husband to purge himself of contempt is seriously jeopardized if the judgment and warrant of commitment are silent as to the amount of maintenance and child support in arrears. This is especially true when the amount is disputed. Purgation of contempt in the sense at hand is accomplished by payment. If the amount to be paid has not been adjudicated and spelled out in the judgment and warrant of commitment the power to purge oneself of contempt is seriously compromised. A blanket reference to non-compliance with the maintenance and child support payments set forth in a decree entered in a dissolution of marriage proceeding, as was made in the instant case, is not sufficient. As pointed out in 24 Am.Jur.2d, Divorce and Separation, § 770, p. 879 "[a] judgment or order in contempt should state the amount which is in arrears so that the husband may pay the sum and purge himself of contempt . . .". The judgment of contempt and warrant of commitment in this case were deficient in this respect. See also *Ginsberg v. Ginsberg*, 122 So.2d 30 (Fla. App.1960). The proponent, notwithstanding the deficiency mentioned, concedes that the husband on March 14, 1975, paid all maintenance and child support payments which were in arrears as of the date of the contempt hearing. The proponent and the husband apparently resorted to their own knowledge of the facts, good judgment and

common sense as to the amount or amounts in arrears. Therefore, any error attached to the complained of deficiency has been rendered moot and purgation of contempt has been effectively accomplished.

■ The propriety or impropriety of placing the husband on probation appears to be the only remaining issue to be resolved. Civil contempt was judicially designed to coerce obedience rather than to impose punishment. *Teefey v. Teefey,* supra. Therein lies the cardinal distinction between civil and criminal contempt. The judgment and warrant of commitment in the instant case did not stop at merely finding the husband in contempt for failure to pay an undetermined number of delinquent maintenance and child support payments and committing him to imprisonment in the Jackson County Jail for such failure. The judgment and warrant of commitment additionally provided that after "serving 6 days, he is to be released from custody on probation for one (1) year, under the supervision of the Prosecuting Attorney, *on condition he make future payments regularly,* and make up arrearage in accordance with a schedule provided by the Prosecuting Attorney." (Emphasis added.) The husband's subjection to probation for one year "on condition he make future payments regularly", thereby exposing him to the possibility of being imprisoned for the remainder of the 90 day sentence fixed by the trial court, reeks of criminal contempt rather than civil contempt. Literally read and construed, the husband could be reincarcerated for the remainder of the ninety day sentence solely upon proof that he missed a future payment of maintenance or child support as scheduled by the decree of dissolution of marriage proceeding regardless of any attendant facts or circumstances. So construed, it would preclude the husband's right to avoid imprisonment for any alleged future nonpayment by showing that he was financially unable to make such future payment and that he had not intentionally placed himself in a position so that he could not do so. *Teefey v. Teefey,* supra. So

construed, it would deprive the husband of the ten day "grace" period statutorily given him by paragraph 4 of Section 452.345, supra, to correct any future delinquency. Civil contempt as a means of enforcing delinquent maintenance and child support payments in this state is a creature of statutory law. Section 452.345, supra. As construed in *Teefey v. Teefey,* supra, it is civil rather than criminal in nature and its purpose is coercive rather than punitive. Paragraph 4 of Section 452.345, supra, provides: "If a party fails to make required payment, the circuit clerk shall send by registered or certified mail notice of the arrearage to the obligor. If payment of the sum due is not made to the circuit clerk within ten days after sending notice, the circuit clerk shall certify the amount due to the prosecuting attorney. The prosecuting attorney shall, with the consent of the obligee, promptly initiate contempt proceedings against the obligor."

■ Section 452.345, supra, obviously contemplates civil contempt as a remedial vehicle for obtaining relief for past derelictions. It is equally obvious that it does not contemplate probation as a means of enforcing future payments. To hold otherwise would judicially negate the provisions therein requiring notice to the "obligor" and consent of the "obligee" before contempt proceedings are initiated by a prosecuting attorney. Placing a husband on probation, conditioned upon timely making future payments of maintenance or support as ordered and scheduled in a decree entered in a dissolution of marriage proceeding, bespeaks of contempt in the criminal sense and is beyond the purview of Section 452.-345, supra. Probation and civil contempt are conceptually incompatible. *Teefey v. Teefey,* supra, appears to support and justify this conclusion. Notwithstanding the fact that the judgment and warrant of commitment before the court in *Teefey* placed the errant husband on probation upon condition that he timely pay all future payments, the court, l. c. 567, noted: "We recognize that if defendant owes any sub-

248

stantial amount of maintenance at the time of this decision that further contempt proceedings will likely be initiated." Although probation was not involved, the Supreme Court of Oklahoma on at least two occasions was faced with attempts by trial courts to give prospective effect to judgments and warrants of commitment in similar contempt proceedings. On both occasions, the Supreme Court of Oklahoma held that judgments and warrants of commitment predicated on past defaults could not apply or extend to defaults in futuro. By way of explanation, they stated that the respective trial courts had exceeded their "jurisdiction", "power", and "authority". See *Ex parte Townsend*, 177 Okl. 286, 59 P.2d 279 (1936) and *Green v. Green*, 373 P.2d 15 (Okl.1962).

■ The proponent contends that the power to place a once errant husband on probation, even though the contempt proceeding is civil in nature, is "critically important" to "assist" and "enable" the state to compel future compliance with maintenance and child support payments spelled out in a dissolution of marriage decree. The thrust of this argument seems to be that the rights and procedural safeguards surrounding a husband when a sentencing court is called upon in the future to determine whether he has violated the terms of his probation should be something less than the rights and procedural safeguards possessed by him in the original contempt proceeding. This argument does not wash and lacks both logic and statutory authority to support it. Stripped of all rhetoric, the proponent argues that the threat of incarceration for future non-compliance will have a "guillotine" effect on a once defaulting husband. Such an argument, by its very nature, seeks to denigrate and do away with certain basic rights and procedural safeguards given a husband regarding future non-compliance with maintenance and child support payments spelled out in a dissolution of marriage decree. The power to initiate future contempt proceedings with regard to future instances of non-com-

pliance is sufficiently effective to impress upon a husband, once found guilty of contempt for failure to pay maintenance and child support payments, the importance and dire necessity of future compliance. At the same time basic rights and procedural safeguards afforded him are preserved.

In view of the adjudicatory void and the impermissible breadth of the judgment and warrant of commitment entered and issued in case No. KCD 28606, namely, the failure to spell out the amount of the arrearages as of the date of the hearing in the judgment and warrant of commitment, and the imposition of probation, the judgment is reversed and the warrant of commitment is quashed. Since the proponent has conceded that the husband paid all arrearages which prompted initiation of the contempt proceeding, thereby purging himself of contempt with respect thereto, remanding the case to the trial court for further proceedings would serve no purpose.

The decree in the case designated in this court as No. KCD 27751 is affirmed; the writ of habeas corpus issued by this court in the case herein designated as No. KCD 28396 is quashed for having been improvidently issued and the husband is released from his personal recognizance and the same is dissolved; the judgment in the case designated in this court as No. KCD 28606 is reversed and the husband is released from all present or future imprisonment thereunder and discharged from the erroneously imposed probation.

All concur.